UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

PETER BIANCO,                          )
                                       )
            Plaintiff,                 )
                                       )
      vs.                              )      Case No. 4:10-CV-2392 (CEJ)
                                       )
MICHAEL J. ASTRUE, Commissioner        )
of Social Security,                    )
                                       )
            Defendant.                 )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social
Security Administration.

## I.  Procedural History

On June 3, 2008, plaintiff Peter Bianco filed an application for disability insurance
benefits, Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, with an alleged
onset date of March 17, 2007.  (Tr. 117-23).  After plaintiff's application was denied
on initial consideration (Tr. 68-71), he requested a hearing before an Administrative
Law Judge (ALJ) (Tr. 81).

Plaintiff and counsel appeared for a hearing on July 23, 2009.  (Tr. 29-61).  The
ALJ issued a decision denying plaintiff's claims on August 31, 2009, and the Appeals
Council denied plaintiff's request for review on October 27, 2010.  (Tr. 1-3).
Accordingly, the ALJ's decision stands as the Commissioner's final decision.  See 42
U.S.C. § 405(g).

## II.  Evidence Before the ALJ

### A.  Hearing Testimony

At the time of the hearing, plaintiff was 48 years old.  He was divorced and lived
with his parents.  He had one child -- a 17-year-old daughter who had recently moved

out of state -- with whom he spoke by telephone every day. (Tr. 34). He attended school into the twelfth grade without graduating. He subsequently obtained his GED. (Tr. 36).

Plaintiff testified that he was last employed as a houseman at a hotel. His duties included vacuuming, mopping and collecting dirty laundry. He injured his right shoulder in a fall on March 17, 2007, when he slipped on grease outside the hotel kitchen. (Tr. 38). He received worker's compensation benefits of $300 a week for a period of time, but the benefits had stopped about eight months before the hearing. (Tr. 56). Plaintiff's previous work history included positions as a hotel maintenance engineer, a carpenter, and a plumber. (Tr. 39-41). These jobs all required heavy lifting. (Tr. 39-40; 57).

Plaintiff reported that he suffered strokes in 2000 and 2007. (Tr. 47). He testified that as a consequence of the first stroke his left arm "doesn't work." When asked to explain further, he stated that he lacks dexterity in his left hand. (Tr. 48). For example, he cannot close a car door using his left arm and hand. (Tr. 52). In addition, he has had pain in his right arm since his fall in 2007l. Plaintiff also has severe atherosclerosis; he required surgery in 2008 to "clean up" his carotid artery. (Tr. 49). Poor circulation makes his legs tired and prevents him from walking far. (Tr. 50). Plaintiff testified that he is not able to do much as a result of these conditions. For example, he had not attempted to do household chores for about a year. (Tr. 54). He stated that he is able to sit, bend, stoop, crouch, kneel and crawl without difficulty. He described himself as "a little unbalanced" when climbing steps. He is able to stand for a couple of minutes and to walk for about a block. (Tr. 51).

Plaintiff testified that he rises at about 9:00 in the morning. His daily activities include drinking coffee, watching television, reading the newspaper and napping. (Tr.

41, 43, 44). He sits outside when the weather is nice. (Tr. 45). His mother prepares meals. He goes to the grocery store with his father. He gets along well with people and described himself as sociable. (Tr. 43).

Plaintiff testified that he was prescribed Lidopen, Atenolol, Prozac, Lipitor, Lisinopril, Tricor, Ibuprofen and Tylenol PM. (Tr. 46-47). He had taken Oxycodone for pain following shoulder surgery but his prescription was discontinued and he obtains adequate pain relief with Ibuprofen. (Tr. 53).

Vocational expert Vincent M. Stock, M.A., provided testimony regarding the employment opportunities for an individual of plaintiff's age and with his education, training and work experience; who is limited to sedentary work, with occasional use of the right arm for reaching overhead and no use of the left arm for reaching or fine or gross manipulation; who has the ability to occasionally climb, balance, stoop, crouch, kneel and crawl; and who cannot climb ladders, ropes, or scaffolds. (Tr. 58). Mr. Stock opined that such an individual could not return to plaintiff's past work. There were, however, jobs available in the national economy, such as security guard monitor and cashier, that could be performed by an individual with these hypothetical limitations. Plaintiff's counsel asked the expert to assume that the individual was restricted from overhead reaching with either arm. Mr. Stock testified that this limitation would eliminate some of the cashier jobs, but that the security guard monitor did not require overhead reaching.

## B. Additional Evidence

Plaintiff applied for disability on June 3, 2008. (Tr. 117-23). The Field Office interviewer noted that plaintiff had difficulty using his hands, and described him as "protect[ing] his left arm in a position as if he could not use it. [H]e wrote his name with [his] right hand but demonstrated his lack of ability in using it much. He was neat

and clean with button shirt." (Tr. 165). In the disability report submitted with his application, plaintiff identified his disabling conditions as right shoulder surgery in August 2007, neck surgery in January 2008, strokes in 2000 and 2007, and high blood pressure. (Tr. 167-75). He stated that his left arm was numb from the elbow down. In response to questions on the Missouri Supplemental Questionnaire, plaintiff stated that he was unable to use his right arm. (Tr. 188-95). Nonetheless, he indicated that he was able to do laundry, dishes, make beds, vacuum, take out trash, home repairs, yard work, banking, go to the post office, and fish. (Tr. 191-92). He shopped once or twice a week, prepared meals, and completed his own self-care and grooming. He drove twice a week to visit friends and family. He got along well with others, was able to follow verbal or written instructions, and did not need reminders to complete chores. His mother completed the form for him because he had difficulty writing.

### III. Medical Evidence

The medical record begins on April 5, 2006, when plaintiff was seen at the Washington University Medical Clinic for treatment of various conditions, including hypertension, cardiovascular accident, and high cholesterol. (Tr. 359-60). He reported that he experienced pain in his right calf when walking. He denied experiencing numbness, tingling, dizziness, syncope, crepitus, and shortness of breath. He reported that he had stopped taking Prozac because he was "doing fine."

Plaintiff underwent a Magnetic Resonance Angiography (MRA) of the cervical vessels on April 28, 2006. (Tr. 354). The procedure disclosed an occlusion of the right internal carotid artery, 60% to 70% occlusion of the left internal carotid artery, chronic infarction of the right occipital and temporal lobes, and a spinal cord syrinx.[1] John A.

---

[1]A syrinx is a fluid-filled cavity within the spinal cord or brain stem. Symptoms include flaccid weakness of the hands and arms and deficits in pain and temperature

Curci, M.D., reviewed the findings with plaintiff on May 16, 2006. (Tr. 351). On examination, it was noted that plaintiff's left arm was weaker than his right and had "somewhat of a contracture deformity." His right arm was normal in strength and sensation. He had claudication[2] symptoms, more so with his right leg than his left. An MRI on May 31, 2006, confirmed the presence of a syrinx in the spinal cord from C6 to T3, in addition to multiple Schmorl's nodes[3] throughout plaintiff's thoracic spine, severe neural foraminal narrowing, and some disc herniation in the cervical spine. (Tr. 349-50).

Plaintiff was referred to neurosurgeon Paul Santiago, M.D., for further evaluation of the syrinx. (Tr. 344-46). Dr. Santiago noted that plaintiff had significant spasticity as well as sensory loss in his left arm following his stroke in 2000. On examination, Dr. Santiago observed that plaintiff had significant tone in his left arm, especially in his hand, where he had difficulty with wrist flexion and extension of his fingers. Sensation was intact "with the exception of globally decreased pinprick" in the left arm. He also had positive Hoffman's and Babinski's responses on the left. Mild abnormalities of the gait were evident. Dr. Santiago approved plaintiff to undergo a stenting procedure.

Plaintiff was seen at the Barnes-Jewish Hospital internal medicine clinic on August 3, 2006 (Tr. 338-40). He reported that he felt "down" and was experiencing decreased concentration and interest. He was given a prescription for Prozac.

Plaintiff underwent an angioplasty and stent procedure on September 15, 2006. (Tr. 335-37). The operative findings included a "fairly severely atherosclerotic" distal

---

sensation in portions of the back and neck. Merck Manual of Diagnosis and Therapy 1812 (19th ed. 2011).

[2]Limping. Stedman's Med. Dict. 360 (27th ed. 2000).

[3]A prolapse of the nucleus pulposa through the vertebral body endplate into the spongiosa of the adjacent vertebra. Stedman's Med. Dict. 360 (27th ed. 2000).

aorta and a small area of ulceration. The procedure significantly increased flow through the femoral artery.

Cervical and thoracic MRIs completed on December 1, 2006, showed a syrinx from C5 to T2-3, multilevel degenerative disc disease of the cervical spine, and increased disc herniation at C6-C7 with mild compression of the spinal cord. (Tr. 325-28). An MRI of the brain stem completed on December 19, 2006, revealed encephalomalacia.[4] (Tr. 324).

Plaintiff fell and injured his right shoulder on March 17, 2007. The records for his medical care immediately after his fall are not included in this record. An MRI of the shoulder on March 28, 2007, showed moderate acromioclavicular (AC) degenerative changes. The posterior labrum was irregular with advanced degenerative changes. There was no evidence of a rotator cuff tear; however, there was a partial tear of the supraspinatus tendon. (Tr. 400-01).

On May 2, 2007, plaintiff saw Charles I. Mannis, M.D., for treatment of his right shoulder. (Tr. 367-68). He reported that physical therapy had improved his condition somewhat, although he still had pain with use of his arm in overhead positions, and when reaching or driving. He also reported that he experienced "constant" throbbing. On examination, plaintiff had tenderness on palpation. He also had positive impingement sign and empty can test while the drop arm test was negative. Plaintiff was given an injection of Kenalog and Nesacaine and was directed to continue physical therapy. Dr. Mannis approved a return to work with "appropriate restrictions if available. Otherwise he is to remain off work." At follow-up on May 16, 2007, plaintiff reported that therapy seemed to be helping somewhat. (Tr. 369). He continued to

---

[4]Abnormal softness of the cerebral parenchyma often due to ischemia or infarction. Stedman's Med. Dict. 587 (27th ed. 2000).

have some tenderness on palpation and a mildly positive impingement sign. Dr. Mannis recommended that plaintiff continue with physical therapy, apply ice, and take ibuprofen. On June 6, 2007, plaintiff reported that his shoulder was better and he was able to do day-to-day activities without difficulty. (Tr. 370). He was released to return to his usual occupational duties as of June 11, 2007.

Plaintiff saw Dr. Mannis on June 20, 2007. He reported that he had returned to work and had been doing well until June 17th, when he experienced a pop in his shoulder while lifting a trash bag. The pain had returned. (Tr. 371). On examination, he had a full range of motion with pain. He had a positive impingement test and mildly positive empty can test. He was diagnosed with probable impingement syndrome of the right shoulder. He received an injection and was placed on light duty. On August 1, 2007, plaintiff reported that his shoulder pain continued and that he felt like he was "back to where it started." (Tr. 372).

On August 28, 2007, Dr. Mannis performed arthroscopic surgery and completed a subacromial decompression of plaintiff's right shoulder. (Tr. 241-42). He corrected a moderate bursal thickening and a small spur off the anterior acromion. At follow-up on September 5, 2007, plaintiff reported some soreness but was doing well. (Tr. 374). He was advised to return to physical therapy. On September 12, 2007, he reported that he had felt a pop in his right shoulder as he reached across his body to open the car door. (Tr. 375). He complained of increased pain and reported that he had not attended therapy. On examination, Dr. Mannis noted mild diffuse tenderness with mild restriction of motion. Dr. Mannis diagnosed plaintiff with impingement syndrome and recommended that he return to physical therapy. On September 19, 2007, plaintiff reported no improvement in pain, despite attending therapy. (Tr. 376). On examination, plaintiff had tenderness around the acromion. He had almost complete

motion, with the exception of internal rotation. Dr. Mannis opined that the popping was due to scar and inflammatory tissue resulting from the surgery. Dr. Mannis injected the shoulder joint and recommended continued therapy.

On October 3, 2007, plaintiff reported that he had experienced no improvement and, indeed, thought his condition was worsening. (Tr. 377). Dr. Mannis noted tenderness around the anterior acromion. Plaintiff had "essentially complete" forward flexion and abduction, but experienced pain. There was slight restriction of adduction and internal rotation. Plaintiff's strength was "fair." X-rays showed degenerative joint disease, but this was unchanged from preoperative conditions. Dr. Mannis was unable to explain the reason for plaintiff's lack of improvement and advised him to continue with physical therapy. At follow-up on October 17, 2007, plaintiff's condition had not improved. (Tr. 378-79). He exhibited limited mobility in physical therapy and complained of popping and pain when using his arm. He felt the pain up the right side of his neck. On examination, Dr. Mannis noted tenderness but there was no significant restriction of shoulder motion and rotation was "relatively" good. There was no audible crepitus. Plaintiff's shoulder was reinjected. Dr. Mannis opined that plaintiff could return to work in a sedentary capacity with no significant use of his right arm, if such work was available.

On November 7, 2007, Dr. Mannis reported that there was no improvement in plaintiff's condition. (Tr. 380). The physical therapist advised him that there had been no progress in decreasing plaintiff's pain. On examination, Dr. Mannis noted diffuse tenderness with essentially complete range of motion with minimal crepitus and no obvious weakness. Dr. Mannis stated that plaintiff could return to work only in a sedentary capacity.

An MRI of the right shoulder completed on November 21, 2007, revealed moderate hypertrophic change of the AC joint resulting in a mild impression on the supraspinatus muscle/tendon complex, a partial tear of the supraspinatus tendon, and irregularity of the glenoid labrum consistent with a tear in that region. (Tr. 399-400). On December 19, 2007, Dr. Mannis noted that plaintiff had fairly global tenderness to palpation. (Tr. 384). Plaintiff complained of pain with all movements, with very slight restriction of motion in all points due to pain. Dr. Mannis reported that plaintiff could complete light duty work and suggested that plaintiff seek a second opinion.

On December 28, 2007, plaintiff went to the emergency room with complaints of headache and changes in his vision. (Tr. 290-98). He was admitted to Barnes-Jewish Hospital. Radiologic tests showed chronic infarctions in the right cerebral hemisphere compatible with plaintiff's earlier stroke. (Tr. 282). There was a new subacute infarction in the left occipital lobe and multiple new small subacute infarctions scattered throughout the left frontal and parietal lobes. These findings were suggestive of an embolic process. (Tr. 279-80). A carotid angiography performed on December 31, 2007, disclosed an occlusion of the right internal carotid artery at its origin, high-grade left carotid artery origin stenoses with development of an extensive deep cervical-external collateral network, and a small thrombus in the left internal carotid artery. (Tr. 259). On January 4, 2008, plaintiff underwent an endarterectomy[5] to address the highly stenotic left internal carotid artery. (Tr. 255-57). During the procedure, it was observed that the plaque was severely hemorrhagic and very tight at the bifurcation. Plaintiff was discharged from the hospital on January 5, 2008. (Tr. 248).

---

[5]Excision of atheromatous deposits in an artery. Stedman's Med. Dict. 589 (27th ed. 2000).

Plaintiff was seen for follow-up by John A. Curci, M.D., on February 5, 2008. (Tr. 362). He reported that he was doing very well since the endarterectomy. He had some numbness in the periauricular area but his neurological functioning in both upper and lower extremities was grossly intact.

On February 15, 2008, plaintiff was seen by Andria L. Ford, M.D., at the Washington University Stroke Center. (Tr. 408-10). Plaintiff reported that he rarely had headaches and his vision was much improved. On examination, plaintiff was noted to be alert, fully oriented, with affect in the normal range. His language was fluent and he was able to follow commands without error. His memory and recall were intact. He had mild facial droop on the left side but facial sensation was intact bilaterally. His neck muscles were strong. He had normal motor tone and normal strength on the right; strength was less than normal on the left. He had moderate spasticity of the left arm and mild spasticity of the left leg. Pinprick and temperature sensation were decreased on the left arm and leg. Fine finger movements and toe tapping were slowed bilaterally. His blood pressure was elevated that day and he reported that he had not taken his medication.

Plaintiff returned to Dr. Mannis on April 16, 2008. (Tr. 381). Plaintiff reported that his symptoms were unchanged and that he still had pain with movement of his arm. Dr. Mannis noted that plaintiff had been examined by Dr. George Paletta,[6] who found somewhat more tenderness of the acromioclavicular joint than Dr. Mannis had found. On examination, Dr. Mannis found increased tenderness, positive impingement sign, and mildly positive cross arm adduction test. Pain was increased with internal rotation. There was no obvious muscle atrophy or weakness. Dr. Mannis concluded

---

[6]The record does not contain any report of this contact.

that a significant number of the symptoms were referable to the acromioclavicular joint. Dr. Mannis injected the joint but told plaintiff that if this did not provide relief surgery was the only available option. Plaintiff stated he was not interested in further surgery.

On May 7, 2008, plaintiff reported to Dr. Mannis that there had been no improvement. (Tr. 382). He reported increased, continual pain. On examination, Dr. Mannis noted mild tenderness, mild restriction of motion, positive impingement sign, and positive empty can test. Cross-arm abduction was painful. There was no obvious weakness. Dr. Mannis recommended arthroscopy with excision of the distal clavicle. Plaintiff rejected the recommendation, stating that he felt that the first surgical procedure had worsened his condition. Dr. Mannis opined that plaintiff had reached a point of maximum medical improvement and could return to work with the following permanent restrictions: no lifting more than approximately 10 pounds, no overhead use of the arm, and no repetitive pushing, pulling, climbing, or operating moving equipment.

Plaintiff saw Dr. Ford on May 9, 2008. (Tr. 405-06). Plaintiff reported continued improvement of his vision. On examination, Dr. Ford's neurologic findings were unchanged from the last visit. Plaintiff denied that he had difficulty sleeping, poor mood, or poor appetite. He had been out of his medications for two weeks. Dr. Ford told him that it is very important for him to take his medications every day because his blood vessels are extremely damaged.

There is a one-year gap in the medical record until May 29, 2009, when plaintiff was evaluated by Shawn L. Berkin, D.O., in connection with his worker's compensation claim. (Tr. 424-34). Plaintiff reported that he had pain and tenderness in his right shoulder that he rated at an intensity of nine on a ten-point scale. He stated that he

could not move his right arm. He could not drive and had difficulty sleeping. On examination, plaintiff had some restrictions in the range of motion of his right shoulder, and muscle strength testing of the right shoulder caused pain. Plaintiff had limited motion of his left arm and was unable to abduct or flex his arm to 90 degrees. Dr. Berkin noted that there was spasticity of the left arm and a loss of supination of the left forearm. Plaintiff had no control of his left fingers and was unable to abduct the fourth and fifth digits or to flex the index and middle fingers. Dr. Berkin's impressions were rotator cuff strain of the right shoulder, impingement syndrome of the right shoulder with subacromial bursitis, and partial tear of the glenoid labrum of the right shoulder. Dr. Berkin imposed limitations on lifting with the right arm up to 10 pounds on an occasional basis, no repetitive lifting with the right arm, and no work with the right arm overhead. Dr. Berkin opined that plaintiff had a permanent partial disability of 40% of the right shoulder, a permanent partial disability of 40% of the body as a whole arising from arterial schlerotic cerebrovascular disease, and a permanent partial disability of 20% of the body as a whole arising from the syrinx. Dr. Berkin opined that plaintiff was permanently and totally disabled for work based on the limited use of his arms, the cerebrovascular disease, the syrinx, and lack of transferable job skills.

### IV. **The ALJ's Decision**

In the decision issued on August 31, 2009, the ALJ made the following findings:

1.  Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2012.

2.  Plaintiff has not engaged in substantial gainful activity since March 17, 2007, the alleged date of onset.

3.  Plaintiff has the following severe impairments: degenerative joint disease of the right shoulder with status post arthroscopic subacromial decompression surgery of the right shoulder, peripheral vascular disease, residuals from a stroke in 2000, degenerative disc disease of the cervical spine, and obesity.

4.  Plaintiff does not have an impairment or combination of impairments that meets or substantially equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Plaintiff has the residual functional capacity to perform sedentary work except that he can lift/carry/push/pull ten pounds occasionally, and less than ten pounds frequently; he can sit for six hours of an eight-hour workday; can stand and/or walk for two hours in an eight-hour workday; can occasionally climb, balance, stoop, crouch, kneel, or crawl; cannot be exposed to ladders, ropes, or scaffolding; cannot tolerate concentrated exposure to extreme cold or vibrations; and can have occasional use of his right arm for reaching overhead and no use of his left arm for reaching or for fine or gross manipulations.

6.  Plaintiff is unable to perform any past relevant work.

7.  Plaintiff was 46 years old on the alleged onset date and is thus a younger individual.

8.  Plaintiff has at least high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination.

10. Considering plaintiff's age, education, work experience, and residual functional capacity there are jobs that exist in significant numbers in the national economy that he can perform.

11. Plaintiff has not been under a disability, as defined in the Social Security Act, from March 17, 2007, through the date of the decision.

(Tr. 13-27).

## V.  Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382(a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Servs., 887 F.2d 864, 868 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant is not, he is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

A.    **Standard of Review**

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so

that a reasonable mind might find it adequate to support the conclusion."  Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  If, after reviewing the record, the Court finds it possible to draw two inconsistent from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

**B.     Plaintiff's Allegations of Error**

Plaintiff contends that the ALJ (1) improperly failed to order consultative examinations regarding his obesity and depression; (2) improperly discounted the opinions of Drs. Mannis and Berkin; (3) made errors in assessing plaintiff's credibility; and (4) relied on improper testimony from the vocational expert.

**1.     Additional Consultative Examinations**

Plaintiff argues that the ALJ erred in failing to order consultative examinations for further evaluation of his obesity, which the ALJ found was a severe impairment, and his depression, which the ALJ found was not a severe impairment.

Plaintiff's height is 5′7″ and medical records show that his weight has generally ranged from 200 to 207 pounds.  These measurements yield a body mass index of greater than 30 which places plaintiff in the obese category.  "Obesity is a 'severe' impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities."  Social Security Ruling 02-1p, 2002 WL 34686281, *4.  The ALJ found that plaintiff's obesity is a severe impairment,  (Tr. 14), that contributed to his physical impairments (Tr. 22), but that did not additionally limit plaintiff's RFC.  (Tr. 26).

Plaintiff periodically complained of depression to his physicians and received prescriptions for Prozac. However, he did not list depression as a disabling condition when he filed his application for benefits. (Tr. 168). And, as the ALJ noted, plaintiff testified at the hearing that he "used to" have depression in 2005 when he had difficulty concentrating (Tr. 50). At the time of the hearing, his concentration was such that he could read a newspaper. (Tr. 50-51). In addition, he testified that he had no difficulties getting along with others and considered himself to be a sociable person. He talked on the phone with his daughter every day. (Tr. 43). Plaintiff did not identify any limitations arising from depression. The ALJ concluded that plaintiff's depression caused no more than mild restrictions in performing the activities of daily living or maintaining persistence, pace and concentration, and no restrictions in maintaining social functioning. (Tr. 16).

"It is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." <u>Haley v. Massanari</u>, 258 F.3d 742, 749 (8th Cir. 2001) (internal quotations and citations omitted); <u>see also</u> 20 C.F.R. § 404.1519a (discussing consultative examinations). With respect to plaintiff's obesity and alleged depression, plaintiff and his physicians have not identified additional functional limitations attributable to either condition. Under these circumstances, the ALJ was not required to obtain additional consultative examinations.

## 2.    The ALJ's Rejection of Medical Opinion

Plaintiff asserts that in reaching his RFC determination the ALJ improperly rejected Dr. Berkin's description of plaintiff's limitations with respect to his left arm and

the opinions of Drs. Mannis[7] and Berkin that plaintiff could not engage in overhead work with his right arm.

"In deciding whether a claimant is disabled, the ALJ considers medical opinions along with 'the rest of the relevant evidence' in the record." Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (citations omitted). The Social Security regulations provide that a treating source's opinion regarding "the nature and severity" of a claimant's condition is entitled to "controlling weight" if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id.; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ will give controlling weight to the opinion of a treating source if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. Wiese v. Astrue, 552 F.3d 728, 730-31 (8th Cir. 2009); 20 C.F.R. § 404.1572(d)(2). Ordinarily, the opinion of a treating physician such as Dr. Mannis is entitled to greater weight than that of a one-time consultative examiner such as Dr. Berkin. See 20 C.F.R. 404.1527(d)(2). In this case, however, their opinions are in agreement and the relative weight given to each is not significant.

## A. Limitations on Plaintiff's Use of His Left Arm

Dr. Berkin found that plaintiff had limited movement of his left arm and was unable to flex his arm to 90 degrees. (Tr. 431). The ALJ determined that Dr. Berkin actually meant to refer to plaintiff's right arm. (Tr. 21). This was error. Dr. Berkin's report clearly differentiates between plaintiff's right arm and his left. More significantly, Dr. Berkin's findings regarding plaintiff's left arm are consistent with those

---

[7]The ALJ also rejected Dr. Mannis's restriction on operating moving equipment. Plaintiff does not challenge this aspect of the ALJ's decision.

of other examiners.  <u>See</u> Tr. 351 (noting weakness and contracture deformity of left arm on May 16, 2006); Tr. 344 (noting significant spasticity and sensory loss in left arm on June 6, 2006); Tr. 504 (noting moderate spasticity and decreased strength of left arm on May 9, 2008).

The RFC imposes limits on the use of plaintiff's left arm for reaching or for fine or gross manipulations.  Defendant argues that these limitations are consistent with Dr. Berkin's recommendation that plaintiff avoid lifting or strenuous activities with his left arm and thus any error the ALJ made in interpreting Dr. Berkin's report is harmless.  It is not clear, however, whether the ALJ's error influenced the limitations he imposed on plaintiff's use of his right arm.  The Court concludes that this error was not harmless.

### B.      Limitations on Plaintiff's Use of His Right Arm

Dr. Mannis imposed permanent restrictions on lifting more than 10 pounds, overhead use of the right arm, and repetitive pushing, pulling, climbing or operating moving equipment.  (Tr. 382).   Dr. Berkin similarly limited lifting to no more than 10 pounds on an occasional basis, with restrictions on repetitive lifting and overhead work with his right arm and frequent breaks in activity to avoid exacerbating his symptoms or causing further injury to his shoulder.  (Tr. 434).

There is agreement between the RFC and the physicians' opinions with respect to the 10-pound limit on lifting.  However, the ALJ stated that he gave little weight to Dr. Mannis's opinion regarding plaintiff's ability to use his right arm for reaching and pushing or pulling.  (Tr. 24).  Plaintiff asserts that the ALJ erred by excluding these limitations from the RFC determination.  The ALJ's statement notwithstanding, a comparison of the RFC and Dr. Mannis's opinion shows agreement with respect to the limitation on pushing and pulling.

There is actual disagreement between the RFC and the physicians' assessment with respect to plaintiff's capacity to do overhead work and his need for rest breaks. The ALJ rejected these restrictions as inconsistent with plaintiff's self-described activities, which include doing laundry, making beds, vacuuming or sweeping, completing home repairs, raking leaves, and mowing the lawn. He also indicated that, twice a week, he drove 25 miles to visit friends. At the hearing, plaintiff testified that with some difficulty he could use his right hand to button or zip his clothes, put on shoes and socks, use a knife and fork, and comb his hair. Contrary to the ALJ's determination, the ability to perform these activities does not conflict with a restriction on overhead work or the need to take rest breaks to avoid further injury to his arm. The ALJ did not identify any clinical observations in the medical record that cast doubt on these restrictions. The Court concludes that the ALJ's decision to reject the restriction on overhead work and the need for rest breaks is not supported by substantial evidence on the record as a whole. This matter must be remanded for redetermination of plaintiff's RFC.

On remand, the ALJ will have the opportunity to reassess plaintiff's credibility and pose a new hypothetical to the VE. Thus, the Court briefly addresses plaintiff's arguments on these points.

### 3. Worker's Compensation and The Credibility Determination

The ALJ noted "that the receipt of worker's compensation benefits appears to have provided a disincentive for [plaintiff] to seek out work." Plaintiff argues that this observation amounts to an improper inference about his credibility. An ALJ may properly consider a claimant's incentive to work in assessing credibility. See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (ALJ noted plaintiff's incentive to work might be inhibited by $1,700 monthly disability check). In this case,

plaintiff testified that he had stopped receiving benefits approximately eight months before the hearing. Thus, it is not clear how significant a disincentive the benefits would have been. Nonetheless, the Court cannot say that the ALJ's consideration of the benefits invalidates the credibility analysis.

### 4. The Vocational Expert's Testimony

The ALJ relied on the vocational expert's testimony to determine the extent to which plaintiff's limitations erode the unskilled sedentary occupational base. (Tr. 27). The expert testified that plaintiff could perform work as a cashier or a security guard monitor. (Tr. 56-61). The ALJ stated that he gave no weight to the expert's testimony regarding the cashier position because the Dictionary of Occupational Titles lists the position as semi-skilled. Plaintiff argues, and defendant concedes, that the security guard monitor position is also classified as semi-skilled. Defendant contends that the ALJ never limited plaintiff to unskilled work. The Court finds that the ALJ's decision is ambiguous on this point.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

Carol E. Jackson

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 10th day of February, 2012.